UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MICHAEL B. TUBBS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:11-cv-92 |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Michael Tubbs appeals the Social Security Administration's ("SSA") decision to deny his application for disability insurance benefits. An administrative law judge found that Tubbs was not disabled within the meaning of the Social Security Act. As explained in detail below, I find that the ALJ improperly ignored evidence in the record that supported Tubbs' claim and will therefore remand this matter to the ALJ to fully and properly develop the administrative record.

## BACKGROUND

Plaintiff Michael Tubbs filed his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in August of 2007, alleging that he became disabled on January 8, 2002 as a result of a mental disability. [R. 229-40.] His applications were denied initially and upon reconsideration. [R. 104-131.] At a subsequent hearing before an ALJ, four witnesses testified: Tubbs, two of his friends, and a vocational expert. [R. 23-99.] The ALJ issued a decision in which he found that Tubbs was not disabled within the meaning of the Social Security Act. [R. 10-17.] Tubbs appealed that decision, but the Appeals Council denied

his request for review of the ALJ's decision. [R. 1-9.] At that point the ALJ's decision became the final decision of the Commissioner, and Tubbs therefore filed this civil action, pursuant to 42 U.S.C. § 405(g), for review of the Agency's decision.

Tubbs is now 37 years old and was 27 years old at the alleged onset of his disability in 2002. [R. 229.] He completed high school in a special education program, receiving mostly A's and B's. [R 296, 336.] Between 1992 and 2007, Tubbs has worked on-and-off as a dishwasher, janitor, stocker, and grocery bagger. [R. 293, 298.]

Since applying for benefits Tubbs has undergone various medical and psychological evaluations. In a December 2003 evaluation, Carl Hale, Psy.D., noted mostly normal results (speech rate and volume, coherent thought processes, and proper orientation) and diagnosed Tubbs with mild mental retardation. [R. 345-49.] In a July 2006 evaluation, Raymond Bucur, Ph.D., assessed Tubbs' IQ score at 69, observed that he spoke with "some minor slurring but was easily understood," and concluded that he was "best suited for very simple jobs in which he can work with his hands" in a structured environment. [R. 158–61, 403–06.] In a January 2008 evaluation, Roger Parks, Psy.D., indicated mostly normal results (including rational and coherent thought processes) but noted that Tubbs had some difficulty with his concentration and diagnosed him with attention deficit hyperactivity disorder (ADHD) and mild mental retardation. [R. 364–67.] Tubbs also indicated to Dr. Parks that medication (Adderall) had improved his attention span. [R. 364.]

A February 2008 mental capacity evaluation by state agency reviewing doctor Joseph Pressner, Ph.D., concluded that Tubbs could follow a routine; concentrate on assigned work with only occasional prompting; perform simple, routine tasks; respond appropriately to instructions

2

and criticism; get along well with co-workers; and independently perform various activities. [R. 368–85.] Another state agency reviewing doctor William Shipley, Ph.D., affirmed Dr. Pressner's conclusions two months later. [R. 386.]  Finally, in a May 2008 evaluation several mental health specialists concluded that Tubbs was capable of making simple daily decisions, should continue to seek employment, could require assistance with making major life decisions, and could benefit from the assistance of a job coach. [R. 394-400.]

      The record of the April 2009 hearing before the ALJ, reflects the central tension of this case: Tubbs clearly has mental development issues that make regular and sustained work difficult, but he also has a fairly substantial employment history.  The most sustained discussion of this tension comes in the testimony from two of his friends.  They testified about their repeated and unsuccessful efforts to get Tubbs a long-term job – he would have a job for a few days and then end up getting fired. [R. 68, 72.] He had tried working with vocational rehabilitation counselors but was still unable to keep a job. [R. 48, 64.]  When Mr. Tubbs was working as a dishwasher, what would take another employee an hour and a half would take him five hours to finish. [R. 39.]  When he worked at McDonalds he could perform simple jobs, but he was unable to multitask and he annoyed customers by talking to them too much and complaining to them that he was hungry. [R. 44.]  He was too friendly with other people to the point that it was socially unacceptable and minor tasks had to be constantly explained to him. [R. 57-58.]

      A vocational expert ("VE") also testified at the hearing.  As is customary in these hearings, the ALJ asked the VE to consider a hypothetical work limitation that he believed Tubbs possessed and to determine what jobs would be available for someone with those

restrictions. The ALJ thus asked the expert whether there were jobs that a person with Tubbs' vocational characteristics could perform if "limited to simple, unskilled positions with no more than superficial contact with supervisors and co-employers and . . . no public contact." [R. 81.] The VE replied that such a person could perform Tubbs's past relevant work as a dishwasher or janitor since those jobs were simple, routine, and repetitive. [R. 81-2.] On the other hand, if the person was off task 15 minutes an hour, if they worked at half the rate as the other employees, or if they had to re-wash dishes, they would not be able to sustain those jobs. [R. 83-4.]

In making his disability determination, the ALJ followed the familiar five-step sequential inquiry prescribed by the SSA's regulation: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

The ALJ determined that 1) Tubbs was not currently employed, 2) his mild mental retardation qualified as a severe impairment, and 3) that his impairments did not meet or medically equal a listing that was conclusively disabling. [R. 12-14.] With respect to the fourth factor, the ALJ found that Tubbs had "the residual functional capacity to perform a full range of work at all exertional levels but is limited to simple, unskilled work with no public contact and no more than superficial contact with supervisors and co-workers." [R. 14.] In his analysis of the fifth factor, the ALJ concluded that, based on Tubbs' residual functional capacity and the

4

testimony of the VE, Tubbs could perform a significant number of jobs in the national economy and was, therefore, not disabled. [R. 16–17.]

## DISCUSSION

My review of an ALJ's decision to deny social security benefits is limited to determining whether the decision is supported by substantial evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Id.* In other words, the ALJ's decision, if supported by substantial evidence and reached under the correct legal standard, will be upheld even if reasonable minds could differ as to the appropriate conclusion. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). It is not my job to re-weigh evidence, choose among conflicting versions of events, decide questions of credibility, or substitute my own judgment for the ALJ's. *Young*, 362 F.3d at 1001.

To receive disability benefits under the Social Security Act, a claimant must be "disabled" as defined by the Act. 42 U.S.C. § 423(a)(1)(E). A claimant qualifies as disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant's physical or mental impairment or impairments must be of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

Tubbs objects to the ALJ's decision on four grounds: (1) the ALJ's decision was biased; (2) the ALJ failed to properly analyze whether Tubbs met or equaled Listing 12.05(C); (3) the ALJ's credibility determination was improper; and (4) the ALJ did not properly account for Tubbs' moderate limitations in concentration, persistence, or pace in his residual functional capacity finding. The second of these arguments is the most persuasive and requires remand.

**I. The ALJ Failed Properly Analyzed Whether Tubbs Met or Equaled Listing 12.05(C)**

Tubbs argues that the ALJ erred in step three of the analysis by failing to consider evidence of Tubbs' alleged attention deficit hyperactivity disorder (ADHD) in analyzing whether he met Listing 12.05(C). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. This is important because if a claimant has an impairment that meets the criteria for a listing (like 12.05(C)), that impairment is presumptively disabling. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

Listing 12.05(C) requires that a claimant have "[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. An IQ over 60 is insufficient by itself to establish disability under Listing 12.05 alone, since people with low IQ's may be able to perform gainful employment. *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007). Thus, a claimant with an IQ between 60 and 70 also must show a "physical or other mental impairment" that creates an additional, and significant, limitation on his ability to work. 20 C.F.R. § 401, pt. 404, subpt. P, app. 1 § 12.05(C). *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (same).

The ALJ agreed that Tubbs met the IQ requirements of Listing 12.05(C), but he disagreed that Tubbs had a "physical or other mental impairment imposing an additional and

significant work-related limitation of function." [R. 13.] Tubbs argues that this conclusion ignored the evidence of his ADHD, which should have qualified as a significant mental impairment sufficient to qualify under Listing 12.05(C).

In making a decision about whether an impairment is "significant," the ALJ is allowed to consider evidence concerning past work history in assessing "ability or inability to function in a work setting." 20 C.F.R. § 401, pt. 404, subpt. P, app. 1 § 12.00(A). *See Adkins v. Astrue*, 226 Fed. Appx 600, 605 (7th Cir. 2007) (while low IQ scores might be an indicator of retardation, other items, "including ... employment history, must be considered and weighed;" claimant failed to prove deficits prior to age 22 even though school records were submitted showing only eighth grade was completed, due in part to his long work history); *Maggard*, 167 F.3d at 380 (no mental retardation, even though a low IQ score existed, in part due to claimant's "ability to withstand the stress and pleasures associated with a day-to-day work activity"). Courts considering whether an individual meets Listing 12.05 generally have focused their analysis on the claimant's IQ scores, education, work experience, activities, and ability to perform daily life activities. *See Adkins*, 226 Fed. Appx. at 605; *Maggard*, 167 F.3d at 380.

Tubbs believes the ALJ failed to analyze his ADHD and as a result reached the erroneous conclusion that his impairment was not significant. Tubbs' argument is focused on a January 2008 diagnosis of ADHD by Dr. Parks. [R. 365-66.] The ALJ did not explicitly discuss this diagnosis.

The Commissioner argues the ALJ didn't need to explicitly address Tubbs' ADHD because an "ALJ's failure to address [certain] specific findings . . . does not [necessarily] render his decision unsupported by substantial evidence because an ALJ need not address every piece of

evidence in his decision." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). The ALJ stated that his analysis of Listing 12.05(c) was based on, among other things, the opinions of state agency consultants and consultative examiners, and the conclusion the ALJ reached (that Tubbs' did not have a significant impairment) tracks the opinions of these examiners, who themselves considered Tubbs' treatment history for any alleged learning disabilities. [R. 13, 15–16, 345–49, 364–67, 368–85, 386, 394–400.] The government argues, therefore, that even if the ALJ should have *explicitly* discussed Tubbs' ADHD diagnosis in his opinion, it amounts to little more than harmless error because the record does not support Tubbs's argument that his ADHD imposed an additional and significant work-related limitation of function. *See Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (burden of showing harmful error on party attacking the agency's determination).

I take the Commissioner's point. As noted earlier, the central tension of this case is reconciling Tubbs mental development issues with his somewhat substantial employment history. If one focuses on Tubbs' work history, it might be easy to conclude that his ADHD is not "an additional and significant work-related limitation of function."

Ultimately, however, the Commissioner's position is unpersuasive. The fundamental problem is neither the Commissioner nor the ALJ have cited any source in the record that explicitly considered and explained why Tubbs' ADHD did not constitute an additional mental impairment imposing a significant work-related limitation of functioning. There is simply no analysis of this point. And as the Seventh Circuit has explained:

> The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge,

8

> had she considered the entire record, might have reached the same result does
> not prove that her failure to consider the evidence was harmless. Had she
> considered it carefully, she might well have reached a different conclusion.

*Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).  The ALJ needed to consider the ADHD. Instead, he only briefly mentioned the psychologist's diagnosis of ADHD in his summary of the evidence [R. 15], while failing to analyze it and explain whether he accepted the diagnosis whether it amounted to a "significant work-related limitation of function" under Listing 12.05(C).  The "failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand" and "[t]he omission of any discussion of  [a claimaint's] impairments in conjunction with the listings frustrates any attempt at judicial review." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)

The case will be remanded so that the ALJ can properly conduct the Listing 12.05(C) analysis.

## II.  Tubbs' Other Arguments

Because remand is necessary for further consideration, I need not address Tubbs' other arguments.  *Eskew v. Astrue*, 462 Fed. App'x. 613, 615 (7th Cir. 2011) (given the court's remand on one of claimant's arguments, it "need not address [her] remaining arguments"); *Fike v. Astrue*, 2012 WL 1200670, at *10, n.6 (N.D. Ind. 2012); *Todd v. Astrue*, 2012 WL 3096681, at *7 (N.D. Ill. 2012).  Nevertheless, in an attempt to provide some guidance on remand, I will briefly analyze each of them.

### A. Bias

Tubbs argues that the ALJ refused to award him benefits because he was biased against him.  The government's initial response is that Tubbs waived the bias argument by failing to

raise it in his appeal to the Appeals Council. Because the government's waiver argument is squarely foreclosed by *Johnson v. Apfel*, 189 F.3d 561, 562–63 (7th Cir.1999), I will address Tubbs' claim of bias.

Tubbs points to two main places in the hearing transcript following statements from the hearing as evidence of this bias:[1]

- The ALJ stated that "once I make a decision on this, it's like I'm condemning these people to disability for the rest of their lives" because there were "counter-incentives" for people to go back to work and worried that he "might hurt [claimants] by putting them on Social Security, because they might never do anything with themselves." [R. 93.]

- The ALJ stated that Tubbs's speech was not consistent with other individuals he knew who were mentally retarded and used an example of a mentally retarded "kid" he knew who worked himself up to being a manager. [R. 96-97.]

He believes that the "tenor of the ALJ's questions" during these points of the hearing are "not that of a neutral fact-finder but one of an advocate with a predetermined mind destined to reach a predetermined result." *Fulwood v. Heckler*, 594 F. Supp. 540, 547 (D.C.D.C. 1984).

Courts "begin with the presumption that ALJs are impartial," *Martin v. Astrue*, 345 F. App'x 197, 203 (7th Cir. 2009), and parties alleging judicial bias bear a "heavy burden." *Keith v. Barnhart*, 473 F.3d 782, 789 (7th Cir. 2007). Thus, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a

---

[1]Tubbs originally pointed to a third section of the transcript that he thought indicated bias – a discussion with the vocational expert about vocational rehabilitation programs for Tubbs so he could go back to work. [R. 70-72.] Tubbs reply brief abandoned this line of argument, however, apparently (and correctly) acceding to the Commissioner's point that in questioning the vocational expert the ALJ was simply attempting to better understand what happened during Plaintiff's past attempt to obtain vocational counseling.

deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

In reviewing the transcript, I do not believe that the ALJ's comments reflect a "deep-seated ... antagonism" towards Plaintiff. *Id.* First, when read in context, the ALJ's comments about the structure of the disability benefits system amount to little more than a somewhat rambling, offhand discussion about the incentives and disincentives at play in the system:

> So it's really, see, the problem that I got, and this is where I'm at, is this is almost the last stretch. People come here for their last gasp. . . . And once I make a decision on this, it's like I'm condemning these people to disability for the rest of their lives. I'm not saying people can't get off, because there's all kinds of work incentives. But the problem is because of the counter-incentives, both in medical and, now, those might change in the future because we're talking about a little bit different medical system. The problem with the counter, disincentives to work, makes it almost impossible for a marginal person who's having a rough time ever to go to work, because the disincentives are so great. So then, I really got to think about it, and on . . . on people who are, where the case is kind of up and I'm trying to figure out what I'm going to do, the fact that they might get better, and, with the help that's on Social Security has to be balanced with the fact that I might hurt them by putting them on Social Security, because they might never do anything with themselves, and they've got some capacity.

[R. 92-93.]

These comments by the ALJ about weighing the incentives and disincentives at play in the system of disability were largely an aside. But it would be a stretch to construe them as evidence of a "deep-seated . . . antagonism" towards disability benefits generally or towards Tubbs specifically. This is especially so because they were in response to his counsel's explanation about Tubbs' plan to get on disability benefits, then later seek vocational counseling and work full time. In that context, the ALJ's comments are not evidence that he would refuse to

11

judge Tubbs' disability claim fairly on the merits, but are rather evidence of a reluctance to find someone disabled based simply on the promise that they would later seek work.

### B. Credibility Determination

Tubbs next challenges the ALJ's credibility determination on the ground that the analysis was conclusory. To determine a claimant's credibility, "an ALJ must consider several factors, including the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). "The finding must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

The ALJ's pointed to numerous inconsistencies between the Tubbs' testimony and other evidence in the record, including the medical record and Tubbs' relatively significant work history, and then resolved those inconsistencies by giving more credence to that evidence rather than to Tubbs' testimony. [R. 14-16.]  However, in this evaluation the ALJ first employed a piece of "meaningless boilerplate seen frequently in decisions from ALJs," *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), stating:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

[R. 15.]  This boilerplate backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility," rather than evaluating credibility as an initial matter in order to come to a decision on the ultimate question of work capacity.  *Bjornson v.*

*Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012).  On remand, the ALJ should take care to avoid this "backwards" analysis, *id.*, and conduct a detailed credibility finding.

### C.  The Residual Functional Capacity Finding

Lastly, in assessing Tubbs' residual functional capacity ("RFC"), the ALJ found that Tubbs was limited to simple, unskilled work.  [R. 14.]  This finding was reflected in the hypothetical posed to the VE, in which ALJ asked whether there were jobs that a person with Tubbs' vocational characteristics could perform if "limited to simple, unskilled positions with no more than superficial contact with supervisors and co-employers and . . . no public contact."  [R. 81.]  Tubbs argues that the ALJ's finding and the hypothetical were flawed because they failed to account for the ALJ's other finding that Tubbs suffers from "moderate difficulties in maintaining concentration, persistence, or pace."  [R. 14.]

In determining the severity of a claimant's mental impairment, the ALJ must address the claimant's degree of functional limitation in four broad functional areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a, 404.1520a(c)(3). The Seventh Circuit has stated that the ALJ must then "incorporate" these limitations into his RFC determination.  *Kasarsky v. Barnhart*, 335 F.3d 539, 543–44 (7th Cir. 2003) (holding that the ALJ erred when his RFC did not "take into account" his finding at step two that the claimant had deficiencies in concentration, persistence, or pace).

As noted, the ALJ found that Tubbs had "moderate difficulties in maintaining concentration, persistence, or pace."  [R. 14.]  The ALJ then found that Tubbs had the RFC to "perform a full range of work at all exertional levels but is limited to simple, unskilled work with no public contact and no more than superficial contact with supervisors and co-workers."  [R.

14.] Tubbs argues that this conclusion was erroneous: that an ALJ cannot properly account for moderate limitations in concentration, persistence, or pace if he restricts the inquiry to simple, unskilled work. Tubbs cites to various Seventh Circuit cases for the proposition that "a limitation to simple routine work does not sufficiently take into consideration limitations in concentration, persistence, or pace." [DE 20 at 13.] *See Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677–78 (7th Cir. 2008); *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004).

The Commissioner responds that the medical evidence supports the ALJ's limitation of Tubbs to simple, unskilled work. The Commissioner points to *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002), in which the Seventh Circuit held that an RFC for simple, routine work adequately accounted for moderate limitations in concentration, persistence, and pace because the reviewing doctor had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could still perform low-stress, repetitive work." *Id.* at 288–89. The Commissioner argues the same is true here: "the ALJ did not merely assume that simple, unskilled work accounted fully for moderate limitations in concentration, persistence, or pace," but rather supported his conclusion with the medical opinions of the state agency reviewing doctors who opined that Tubbs could perform simple, routine work and that his impairments did not meet a listing despite moderate limitations in concentration, persistence, or pace. [DE 27 at 20.]

Which side has the better of the argument on this issue is open for debate. Since remand is already necessary, however, the best course is simply to direct the ALJ to follow the Seventh Circuit's recent direct guidance on the issue. In *O'Connor–Spinner v. Astrue*, 627 F.3d 614 (7th

14

Cir. 2010), the court stressed that "[i]n most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace.  The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id.* at 620 (internal citations omitted).  Therefore, on remand the ALJ should take care to "refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id.* at 620-21.

## CONCLUSION

For the reasons stated above, this cause is **REMANDED** for further proceedings consistent with this order.

**SO ORDERED.**

ENTERED: September 11, 2012

s/ Philip P. Simon<br>
PHILIP P. SIMON, CHIEF JUDGE<br>
UNITED STATES DISTRICT COURT